Schuyler G. Carroll
John D. Penn
David F. Olsky
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, New York  10112-0085
Telephone: 212.262.6900
Facsimile: 212.977.1649
scarroll@perkinscoie.com
jpenn@perkinscoie.com
dolsky@perkinscoie.com

Attorneys for the Official
Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>OAK ROCK FINANCIAL, LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 8-13-72251-reg |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of the bankruptcy estate of OAK ROCK FINANCIAL, LLC,<br>          Plaintiff,<br>    v.<br><br>ISRAEL DISCOUNT BANK OF NEW YORK, Individually and as Agent Under Certain Credit Agreements, BANK LEUMI USA, BANK HAPOALIM B.M. and CAPITAL ONE, N.A.,<br>          Defendants. | Adv. Pro. No.  8-14-08231-REG |

## FIRST AMENDED COMPLAINT

The Official Committee of Unsecured Creditors (the "***Committee***") on behalf of the

bankruptcy estate of Oak Rock Financial, LLC, the debtor and debtor-in-possession in the above

captioned case (the "***Debtor***", "***Oak Rock***" or "***ORF***"), having been granted leave to commence,

prosecute and settle claims and/or causes of action against the named Defendants, by and through undersigned counsel, alleges as follows:[1]

## PRELIMINARY STATEMENT

1.      ORF's principal pled guilty to a massive fraud that led to the collapse of its lending business and cost creditors tens of millions of dollars.  ORF raised millions of dollars by promising that it would use the new money it received to make loans to its customers ("Dealers") who would finance consumers' purchases, and then pay returns from the consumers' loans to those who advanced the new money.  When those consumer loans defaulted, ORF camouflaged those problems.

2.      Similar to a Ponzi scheme, by 2009 if not earlier, ORF was making payments at least in part from new money it received, rather than from payments generated by the consumer loans.  IDB has admitted that ORF was engaged in a Ponzi scheme, and also that it received transfers in furtherance of that scheme.[2]

> THE COURT: Is there any evidence that this was a
> Ponzi or some form of orchestrated fraud other than -- fraud
> other than fraud?
> MR. HADDAD [IDB Counsel]: Well, no --
> THE COURT: Fraud other than the fraud that was
> perpetrated on the banks?
> MR. HADDAD: Well, the very nature of what Mr. Murphy
> allocuted to --
> THE COURT: I know what his allocution is.
> MR. HADDAD: -- the very nature of that suggests that
> he was literally robbing Peter to pay Paul. And you used the
> term Ponzi scheme. I mean, Ponzi scheme is a very -- Mr. Ponzi
> was doing something with European stamps; it's come down to any

---

[1]      This Complaint includes Confidential Information that is subject to one or more protective orders by this Court.  Consequently, a redacted version is filed along with a request to approve the filing of an unredacted version under seal.

[2]      Prior to making these representations to the Court, IDB had received the results from a forensic examination of the Debtor's books and records.  The results of that investigation were shared with Participant defendants in the then pending Adversary Proceedings.

kind of scheme where you're taking money from newer investors
and using that to keep older investors current and it
ultimately will collapse under its own weight. I mean, in that
respect, that's what happened.  And we'll get to the ZFI case
later this afternoon, but --
THE COURT: No, no, no --
MR. HADDAD: -- they brought in a million dollars
right before.
THE COURT: -- just stay where we are for the moment.
MR. HADDAD: Sure.
**THE COURT: Are you suggesting that monies raised from**
**whatever sources in this case by Oak Rock were used not in the**
**manner required but were rather used to pay old investors, old**
**bills, operating expense, IDB? Is anybody suggesting that?**
**MR. HADDAD: Yes. I believe that is the -- that's the**
**very nature of the fraud . . . .**

2/13/2014 Hearing Tr. at 76:25-78:3 (emphasis added).

3.      As is common in Ponzi schemes, ORF made payments and incurred debts to the

Defendants that were part and parcel of, and in furtherance of, ORF's massive fraud.  The

payments that the Defendants received and the debts that ORF incurred must be set aside and

recovered by ORF's bankruptcy estate since those transfers were made in furtherance of ORF's

scheme, and the Defendants were not good faith transferees.   They were at a minimum on

inquiry notice of the Debtor's insolvency and the ongoing fraud upon its creditors.

4.      Indeed, as ORF's primary lender, IDB was closer to ORF and had more contact,

control and information about ORF than any other creditor.   From the outset, IDB was

responsible for managing ORF's collateral.  IDB was so close and had such control that IDB was

an "insider" under the Bankruptcy Code.  The field examination reports it received regarding

ORF's operations and assets and warned IDB many times over many years about the very acts

that resulted in the guilty plea and creditor losses.  IDB even employed John Murphy's son-in-

law in its credit risk department.

5.      IDB shared much of the information it received in the field examination reports with the other Defendants, although it suggested that the field examiner soften some of the most damaging information about ORF before IDB provided the reports to the other Defendants.  The other Defendants agreed to join the lending group even though the warnings from the field examination reports (even in their softened states) and the Defendants' own diligence investigations provided them with numerous glaring "red flags" (*i.e.*, information about irregularities, inconsistencies, improprieties, inaccuracies or problems at ORF or with ORF's reporting that would have caused a reasonable lender to conduct further investigation).   They never followed up on these red flags and/or were willfully blind to them, as described herein.

6.      Further, notwithstanding these red flags, IDB and the other Defendants kept ORF in operation and forced ORF to get new money to reduce their exposure.  That new money came from the very parties who make up the unsecured creditor body in this case.  In doing so, the Defendants benefited themselves, at the direct expense of ORF's other creditors.  For years, IDB encouraged ORF to sell Participations in Dealer Loans that it knew to have suspect collateral so as to reduce the exposure of the banks in the lending group.  Then, just weeks before ORF collapsed, IDB pushed ORF's principals to shift ever more risk on unsuspecting creditors, by getting new money from them that was used to pay the Defendants, when they knew or should have known that ORF had been insolvent for years and these new funds would never be repaid.

7.      After ORF paid the new money to IDB, IDB exacerbated this shifting of risk to unsuspecting creditors by claiming to have priority above the newly sold loan participations with respect to the underlying Dealer Loans -- even though all internal documents and communications among the Defendants made clear these participations were excluded from the Defendants' collateral.  In doing so, IDB pushed ORF to take funds from creditors to benefit IDB

and the other Defendants and directly prejudiced those creditors for the benefit of IDB and the other Defendants.

8.      IDB was so close to ORF that their Credit Agreements required that IDB receive logins and passwords for direct 24 hour access into ORF's computerized financial records to monitor the underlying receivables in real time just like an ORF officer.  IDB's field examiner has admitted that he warned IDB for many years that the loan was not "safe and sound", and that the borrowing base certificate was fraudulent.  For IDB or any of the other Defendants to claim that they were unaware of what ORF actually was doing, they had to be willfully blind to the information they were receiving and the warnings that were being delivered.  Accordingly, the Committee requests that their  claims be equitably subordinated to unsecured creditors.

9.      The liens asserted by IDB on behalf of itself and the other Defendants have defects that preclude a secured claim from being allowed.  Those defects include a UCC-1 financing statement that ceased to be effective when the underlying loan was repaid, another UCC-1 financing statement that lapsed and its last UCC-1 financing statement that must be avoided as a preference.  Moreover, all such obligations and UCC-1 financing statements must be set aside as fraudulent transfers and/or conveyances.  In short, the secured position that IDB asserts on behalf of itself and the other Defendants does not exist and the Complaint requests a declaratory judgment that IDB and the other Defendants have no liens on ORF's assets.

10.      IDB presents itself as an outsider, an arms-length lender.  The truth is that IDB was an insider in every sense of the word, should be treated as such by returning what it received and having its claims subordinated to bona fide creditors.  Similarly, IDB and the other Defendants must disgorge the transfers and obligations that were fraudulently transferred to them.

130565070.1

## THE PARTIES

11.     The Committee was appointed by the United States Trustee on May 27, 2014 (Docket No. 574) and amended on June 19, 2014 (Docket No. 614) pursuant to Section 1102(a)(1) of title 11 of the United States Code (the "***Bankruptcy Code***").

12.     ORF is the Debtor on whose behalf this action is filed.  The Defendants are creditors of ORF that either filed a proof of claim in ORF's bankruptcy case or had a proof of claim filed on their behalf.  The Defendants received transfers of property from ORF, including but not limited to the transfers identified in Exhibit A.[3]  ORF incurred obligation to Defendants, including but not limited to the obligations identified in Exhibit B.

13.     In addition to the standing provided in 11 U.S.C. § 1109 and relevant precedential authority, this Court authorized the Committee to commence, prosecute and compromise causes of action on behalf the ORF's bankruptcy estate by its Order entered August 12, 2014, Docket No. 674 in ORF's bankruptcy case.

14.     The Defendants consist of: Israel Discount Bank of New York ("IDB"), Bank Leumi USA ("***Leumi***"), Bank Hapoalim B.M. ("***Hapoalim***") and Capital One, N.A. ("***Capital One***").  IDB acts as the agent under one certain Credit Agreement and prior similar agreements. IDB, Leumi, Hapoalim and Capital One are lenders under the Credit Agreement.

15.     IDB, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, has been served and has filed an answer herein.  On and after May 9, 2006, IDB acted individually and as the "agent" of the members of the syndicated bank group as

---

[3]   A substantial amount of the funds paid to IDB were for the benefit of the lending group such that significant amounts of those funds were subsequently transferred to the other Defendants based on their relative interests in the bank group as that changed from time to time.

130565070.1

the bank group was composed from time to time.  Also as noted below, all relief sought against IDB is also sought against each the members of the bank group as a result of IDB's actions.

16.     Leumi, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, has been served and has filed an answer herein.

17.     Hapoalim, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, has been served and has filed an answer herein.

18.     Capital One, an insured depository institution as defined in section 3 of the Federal Deposit Insurance Act, has been served and has filed an answer herein.

19.     On April 29, 2013 (the "Petition Date"), IDB, Leumi and Hapoalim filed an involuntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court, Eastern District of New York (the "Court") against ORF.

20.     On May 6, 2013, the Court entered an Order approving ORF's motion seeking to convert this case to a case under Chapter 11 of the Bankruptcy Code and denying the relief sought under the involuntary petition.

21.     ORF continues to manage and operate its business as debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108 under its Chief Restructuring Officer.  On August 12, 2014, the Court authorized the Committee to commence this action on behalf of ORF's bankruptcy estate (Docket No. 674).

## JURISDICTION AND VENUE

22.     This civil proceeding arises under and otherwise relates to a case under the Bankruptcy Code.  This is a core proceeding pursuant to Section 157(b)(2) of title 28 of the United States Code.  This Court also has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. § 1334, 11 U.S.C. §§ 502, 510, 544, 547, 548, 550, 551, 2201 and 2202 as well as N.Y. Debt. & Cred. §§ 273, 274, 275 276, 276-a, 278, and 279.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1409.

24.     This adversary proceeding is initiated under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

25.     The Court's cash collateral order in ORF's bankruptcy case required the Committee to assert any causes of action against IDB on or before August 18, 2014.  The First Amended Complaint is based upon the discovery obtained to date.  Discovery is ongoing and the Committee expressly reserves is right to amend this Complaint as additional evidence is obtained regarding the relevant facts and circumstances.

26.     Pursuant to 11 U.S.C. § 544(b), the Committee on behalf of ORF's bankruptcy estate, is also empowered to assert claims and causes of action to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" under 11 U.S.C. § 502.  There exist one or more creditors with such claims that date well before 2005.  Such creditors include (i) Christopher Dowd, Custodian for Matthew Dowd (a minor child), as reflected on the proof of claim designated as Claim No. 68 on the Claims Register in this case (for a loan participation dated September 8, 2004); (ii) Jeffrey Rapaport, as reflected on the proof of claim designated as Claim No. 35 on the Claims Register in this case (for a loan participation dated February 13, 2007, amended on September 9, 2008 and December 24, 2008); and (iii) Redstone Business Lenders LLC, as reflected on the Amended proof of claim designated as Claim No. 72 on the Claims Register in this case (for loan participations dated November 17, 2008, February 12, 2009, January 5, 2009, February 5, 2008, April 24, 2004, April 2, 2007,April

11, 2012, July 31, 2008, December 14, 2001, October 13, 2009, July 20, 2009, April 14, 2010, April 2, 2007, September 14, 2010, December 13, 2006, as each are amended).

## FACTUAL ALLEGATIONS[4]

27.     In 2001, ORF was incorporated in Delaware as a limited liability company.  Its co-founder and day-to-day manager during all relevant times was John P. Murphy ("Mr. Murphy").  ORF was an asset-based lending company that participated in financing installment contracts for the purchase of goods ranging from automotive products, furniture and electronics to equipment and appliances.

28.     ORF made loans to Dealers ("Dealer Loans").  The Dealers then reportedly used these funds to finance installment contracts for the purchase of consumer goods, to extend small business loans or accounts receivable (cumulatively, "Consumer Loans"). The payments on Consumer Loans -- some of which were paid by consumers directly to ORF and some of which were forwarded by Dealers to ORF -- were supposed to pay down the Dealer Loans to ORF.

29.     ORF obtained funding primarily through three sources: (1) a credit facility with Defendants, (2) equity and loans from its owners, and (3) the sale of "loan participations" in the Dealer Loans (the "Participations") to third parties (the "Participants").

30.     ORF sold Participations to individuals as investment vehicles.  Indeed, certain Participants viewed Oak Rock as an "investment company."

31.     On a monthly basis, ORF made payments to the Defendants, the equity holders, and the Participants.  Prior to April 2013, ORF did not miss a payment.

---

[4]   The factual allegations in this Complaint apply to all causes of action.

## **IDB's Close Relationship with Oak Rock Financial**

32.     ORF had a banking relationship with IDB since its inception in 2001.  No lender to ORF had a longer, deeper or closer relationship with ORF than IDB.  IDB was to manage ORF's collateral.

33.     In 2006, IDB ceased lending to ORF in its individual capacity and instead assembled a syndicated bank group that included Leumi to lend to ORF.  IDB served as the "agent" bank of the group and was authorized to act on behalf of the other lenders.  Over the course of the many years that followed, IDB spent a significant amount of time and effort soliciting and retaining lenders to be part of the syndicated bank group.  Over the years, a number of different lenders joined with and disassociated from the bank group.  As a lender would join the syndicated bank group, it would sign an "Instrument of Accession" to bind itself to the agreements initially signed by IDB as part of the loan facility.

34.     One of the requirements under the various Credit Agreements was to allow IDB to conduct field examinations of ORF's operations and assets (the underlying loans by ORF) at ORF's expense.  From and after 2001, IDB (or those acting at its direction) conducted those field examinations.  Also, each loan agreement or Credit Agreement beginning in 2004 (if not earlier) through the most recent version included a requirement that ORF provide its then current computer access codes to IDB to give IDB direct and continuous access to ORF's computerized books and records regarding ORF's loans, receivables and items IDB claimed as its collateral.  As a result of the field examinations, real time access to ORF's financial records and the other contacts and connections between IDB personnel and ORF, IDB had more information regarding ORF's assets, liabilities and operations than any other creditor.

35.    The relationship between IDB and ORF was so close that during 2012 Christopher Dowd, the son-in-law of ORF's co-founder, Mr. Murphy, was employed by IDB as a First Vice President, Credit Risk Management.  The Credit Risk Management department at IDB is the department responsible for overseeing loans and credit policy to either prevent or mitigate the type of fraud that Mr. Murphy pled guilty to committing.  IDB was aware for many years that Mr. Dowd held Participations on behalf of his children.  The Committee will obtain discovery regarding Christopher Dowd's employment will develop additional facts regarding the further connections between Christopher Dowd, IDB and ORF.

36.    IDB also exercised control over the management structure at ORF.  The operating agreement for ORF, which was amended in 2010, permitted ORF's members to exercise significant oversight over Mr. Murphy.  This included requirements that certain defined actions (including the sale of assets) had to be approved by the other members.  The defined actions included material decisions affecting Oak Rock.  The operating agreement (and its amendment) also permitted the members to replace Mr. Murphy as the managing member.

37.    Oak Rock's members were afforded very little discretion because IDB could declare a default under the credit agreement if the members sought to exercise their powers under the operating agreement and its amendment.  If the members replaced Mr. Murphy, it was an event of default under the credit agreement.  The lack of effective discretion became indisputable when IDB declared an event of default and sent a letter accelerating the promissory note when Mr. Murphy resigned after the fraud was announced.  Had IDB declared a default as a result of Mr. Murphy being replaced or his responsibilities curtailed, ORF would need to cease operations.

38.     The result was that, despite their considerable misgivings about Murphy's management no later than 2012, ORF's other members exercised virtually none of the supervisory powers afforded to them in ORF's operating agreement (or its amendment) until it was too late.

39.     IDB also exercised significant control over one of the most important aspects of ORF's business -- when ORF could write off defaulting Dealer Loans.  IDB was aware that certain dealers had chronic overadvances to Oak Rock, with some overadvances lasting for years.  Mr. Murphy sought IDB's permission before he wrote down any such overadvances.

40.     IDB also directed ORF to sell more Participations in Dealer Loans.  In particular, IDB instructed ORF to reduce its exposure to the dealers with the highest default and dilution (such as auto dealers) by selling Participations.  As set forth below, IDB also instructed ORF to sell Participations in a Dealer Loan when ORF violated a concentration limit with respect to a Dealer.

### The Fraud at Oak Rock

41.     On December 20, 2013, Mr. Murphy pled guilty to a number of allegations contained in a criminal information.  Among other things, Mr. Murphy pled guilty to committing bank fraud, including "[be]ginning in January 2009 and continuing through April 2013, the defendant JOHN MURPHY, together with others, deliberately and falsely overstated the accounts receivable on the consolidated financial statements and [Borrowing Base Certificates] that were supplied to [IDB].  According to his plea, Mr. Murphy "achieved this result by a variety of means, including: (a) changing delinquency dates to keep collateral and loans current; (b) booking fictitious payments, thereby creating fictitious accounts receivable; and (c) 'reaging'

delinquent accounts receivable by copying data from timely paid accounts to make the loans appear stable and unlikely to default."[5]

42.    As IDB has acknowledged (see above), the conduct to which Mr. Murphy plead guilty (bank fraud) was part of a broader range of misconduct in which Mr. Murphy disguised ORF's losses and hindered, delayed, and/or defrauded his creditors.  As IDB has also acknowledged, Mr. Murphy, in effect, ran a Ponzi scheme in which he was required to use the monies from new funding sources to meet ORF's ongoing monthly payment obligations to its creditors, because revenue from operations was insufficient to meet those obligations.

43.    ORF's funds were comingled in a single operating account. As a result, as IDB has also acknowledged, the payments received by the Defendants were not payments solely from ORF's operations, but instead included monies that ORF had fraudulently obtained from others. ORF continued to timely pay Defendants and its other creditors in order to forestall the day that the scheme collapsed.  The payments to Defendants and the obligations incurred to them were (as IDB has acknowledged) in furtherance of the scheme because, among other reasons, the continuing payments gave the appearance of solvency and of a successful business.

44.    ORF's primary assets were Dealer Loans that were backed by the Dealers' Consumer Loans.  It was otherwise thinly capitalized and held few other assets.

45.    ORF, however, overstated the value of its assets as early as 2002.  It engaged in a practice of "reaging" and "delinquency adjustments" of Consumer Loans.  From the outset of the company's existence, Murphy periodically received requests from Dealers to consider a delinquent consumer customer "current" and move the missed payments to the end of the loan. Murphy granted certain of these requests even though he was not allowed to do so under ORF's

---

[5]    U.S. v. Murphy, Case 2:13-cr-00702-LDW-GRB, U.S. District Court for the Eastern District of New York, Docket No. 4.

credit agreements with Defendants.  Later he made numerous similar adjustments even though the Dealers did not make the request.  For many years, ORF did not keep track of such adjustments, and this had the effect of overstating the actual value of ORF's assets.  The actual value of the borrowing base that was reported to lenders for example was materially overstated by 2002, meaning the company was likely insolvent near its outset.

46.    ORF also for years maintained "overadvances" on certain Dealer Loans -- advances above those permitted under the particular Dealer Loan agreement with that Dealer. Typically, the reason that a Dealer Loan was overadvanced was the deterioration in the collateral supporting that that Dealer Loan (*i.e.*, the Consumer Loans generated by the Dealer).[6]  Even though ORF should have written down the value of such Dealer Loans, ORF instead (with the Defendants' knowledge and acquiescence) did the exact opposite: it advanced additional funds and allowed these poorly performing Dealers to generate more Consumer Loans.    Not surprisingly, the new collateral deteriorated as well, and the hole grew deeper.

47.    ORF (also with Defendants' knowledge and acquiescence) sold Participations in chronically overadvanced Dealer Loans.  These Participants were dependent on the continued solvency and managerial expertise of ORF.  They relied on the efforts, knowledge and skill of ORF to earn a return on their investment.

48.    ORF took numerous steps to create the appearance of solvency.  This included Oak Rock making false statements to the Participants.  Participants were sent statements that identified the principal they had invested, and their investment return (*i.e.*, the interest that had

---

[6]    For example, ORF extended a Dealer Loans to Now Auto, an auto dealer in Phoenix, Arizona.  Now Auto's loan was collateralized by Consumer Loans used to purchase automobiles.  By mid-2008, the Consumer Loans supporting Now Auto's Dealer Loan had deteriorated to the point that Now Auto was out of compliance with its loan to ORF.  ORF nonetheless continued to lend money to Now Auto to write new Consumer Loans, even though neither the Dealer Loans nor the related Consumer Loans supported the monies advanced by ORF.

purportedly accumulated on the principal).  These statements were false because they provided reassurance to the Participant that the underlying Dealer Loan was performing and its share of the collateral was the same as when the Participation was sold; in fact, many of these Dealer Loans were in default.

49.    ORF also continued to pay on Participations as though the Dealer Loans (and Consumer Loans supporting the Dealer Loans) had not deteriorated.  Murphy has admitted under oath that he did so in order to keep Participants from raising issues that threatened the entire scheme.  ORF was thus able to forestall the day in which Participants sought to redeem their investments, which in many instances were not supported by the underlying Dealer Loan.

50.    Another manner by which ORF provided the appearance of solvency was through the manual entry of "dealer payments" -- payments that a dealer purportedly provided to ORF on behalf of a customer.

51.    At Murphy's direction, ORF employees manually entered "dealer payments" on Consumer Loans into ORF's computer system that reduced the outstanding balance on the applicable Consumer Loan (and which in turn reduced the amount owed by the Dealer on the applicable Dealer Loan).  The instructions to enter dealer payments were provided on a piece of paper that was then discarded.  However, as soon as these amounts were entered, ORF booked an advance to the Dealer of the same amount, resulting in a "round trip" transaction.  On information and belief, many of the customer payments that were recorded by these employees in ORF's systems did not exist and were instead merely accounting entries used by Murphy to create the appearance that Dealer Loans and the Consumer Loans securing the Dealer Loans had been performing.

52.    ORF had no audit function that tested either the Dealer Loans or Consumer Loans, apart from its computer system.  Apart from a brief period shortly before the Petition Date, ORF also did not keep track of the number of Dealer Loans and Consumer Loans it re-aged, the dilution rate on those loans, or the number of "dealer payments."

53.    ORF commingled all funds it collected into one operating account, including all monies that it received from lenders, Participants, Dealers, the obligors on Dealer Loans and its owners.  It used the single operating account to pay all creditors, including lenders, Participants, and equity holders as well as providing advances to Dealers.  IDB was aware of and acquiesced to this comingling.

54.    As a result of these practices, ORF was insolvent by 2006, if not earlier, in that the amount of its liabilities was greater than the value of its assets at a fair valuation.

55.    By 2009, in addition to the dealer-initiated "delinquency adjustments" and "dealer payments," Murphy began making additional manual adjustments regarding entries with respect to Consumer Loans without any prompting from the Dealer to make it appear that the Consumer Loans were current and collectible.  The adjustments involved typing in information into customer accounts that would "reage" customer delinquencies to make them appear current, a technique similar to his prior inappropriate adjustments to customer accounts.  This was accomplished by changing the due date of the missed payment(s) to move them to the end of the respective loan's terms.

56.    At some point thereafter, Murphy had IT personnel at Oak Rock create a duplicate system --  called the "BMS system" -- so that he could further manipulate the information represented as the records regarding Consumer Loans that he showed to outside parties.  He

presented the data from the BMS system, which he had specially manipulated, to IDB's field examiners and to Oak Rock's auditor.

57.     The value of the assets reported by Oak Rock was overstated by tens of millions of dollars by the time that IDB, Bank Leumi, and Bank Hapoalim filed an involuntary petition on April 29, 2013.

58.     The revenues from Oak Rock's legitimate activities were not sufficient to sustain the monthly interest payments to creditors and its operating expenses.  The only way that Oak Rock was able to continue operating was as a Ponzi scheme, using monies from one source to pay another.  As the Chief Restructuring Officer reported, "From 2010 to 2012, Oak Rock raised approximately $53 [million] in permanent funding through increases in its revolving line of credit and subordinated debt, as well as in funding from the sale of participations and equity contributions. These funds were essentially used to pay approximately $52 [million] in interest expense, distributions to equity and overhead."

### The Defendants' Knowledge of the Oak Rock Fraud.

59.     The Defendants knew or should have known of the irregularities and improprieties that left the inaccurate impression that ORF's financial condition was substantially better than it actually was (including those irregularities and improprieties that matured into the guilty plea).  These irregularities and improprieties had the effect, among others, of overstating the customer accounts that would be eligible for ORF to borrow against and otherwise masking problems with the loans and accounts receivable that ORF reflected and reported among its assets.

60.     The Defendants were on inquiry notice because beginning no later than 2008, IDB's field examiner (KDMB Lender Advisory Services LLC ("KDMB")) repeatedly provided

- 17 -

reports to IDB with information to the effect that the facility to Oak Rock was not "safe and sound" and that information in ORF's borrowing base certificates was likely to be materially inaccurate.

61.     Knowing that it would use these reports to recruit new members of the lending facility, IDB provided KDMB with edits to its reports intended to soften some of the conclusions.  For example, IDB asked KDMB to include in its report ORF's calculations of the dilution of its largest Dealer Loans (*i.e.*, the percentage that was likely to be uncollected). KDMB did not agree with management's calculations, but nonetheless did as it was told and included statements from ORF in its reports.

62.     Even with IDB's edits, however, the field examination reports still identified red flags to each Defendant.  KDMB warned repeatedly in its examination reports beginning no later than 2008 that ORF was overstating the value of Consumer Loans.  The warnings were not heeded, and thus Defendants continued to receive payments from ORF, the proceeds from the sale of "participation agreements" and otherwise adversely affect ORF's creditors at the expense of the creditors.

63.     As a result of KDMB's field examinations, by 2008, IDB (and then the other Defendants) knew that ORF would falsely note in its financial records (and then report to others) that it received payments from one or more of its customers' borrowers when, in truth and fact, ORF never actually received the funds and in many instances the funds never actually changed hands.  Upon information and belief, certain of ORF's customers would report that they had received one or more payments.  ORF would not confirm the receipt of such funds or that the underlying loans were in fact being kept current by the end borrower. Despite this knowledge, IDB permitted ORF to continue the practice over a number of years.

64.     KDMB also reported to IDB in the reports generated from the field examinations in and after 2008 (if not earlier) that ORF was engaged in the "reaging" of delinquent accounts (including using a technique called a "delinquency adjustment" that masked delinquent loans by, among other things, adding late or missed payments to the end of the term so ORF's borrower could appear to be current on such loans).  Such practices created the impression that delinquent accounts from a loan customer were actually current and performing when that was not the true state of ORF's affairs.   Notably, the very activities that were included in Mr. Murphy's guilty plea were referenced in KDMB's reports.

65.     Beginning in 2008 (if not earlier), IDB (and then the other Defendants) thus had either actual or constructive knowledge of the Debtor's practices of "delinquency adjustments" and claiming credit for payments reportedly received from its customers but that that Debtor never actually received.  Alternatively or additionally, Defendants engaged in willful blindness with respect to these issues by consciously disregarding repeated warnings they were receiving regarding those actions.

66.     KDMB's report following its field examination that occurred on December 7 - 9, 2010 shows that the "delinquency adjustments" were already known to IDB, had been previously reported to IDB and were quite significant in 2010.  Nevertheless, ORF continued to solicit and obtain "loan participations" in 2010, 2011, 2012 and 2013 with IDB's encouragement.

67.     For example, a common statement in multiple field examination reports was,

 We were informed that these types of delinquency adjustments are only granted once during the life of a contract. However, according to our discussions, ***ORF does not  monitor the frequency or the performance (effectiveness) of the delinquency adjustments***.

We were informed that only John Murphy (President), Chris Murphy (Vice

President), or Ryan Dassau (Vice President) can approve a delinquency adjustment. ***While ORF's delinquency adjustments have the effect of (at least temporarily) keeping collateral accounts eligible that may otherwise become ineligible (sooner than without the delinquency adjustment)***, the effect on the BBR is likely to be fairly minimal, particularly if the volume of this activity is as limited as management believes it is and if individual accounts are only granted one such adjustment.

While we were informed just after the ***January 2009 field examination*** was completed that the amount of deferred / extended accounts in excess of $400 thousand would be added as a line item on future monthly BBR's, we did not find that this had occurred as of the date of this most recent field examination visit.[7] (Emphasis supplied.)

68.    Excerpts from page 10 of the December 2010 report provide the following regarding the consultants' sample of 26 "judgmentally selected accounts":

As a result of performing the manual loan account re-aging procedure, we noted that 15 of the 26 accounts in this sample ***(approx. 58%)*** had been granted what ORF refers to as a "delinquency adjustment." ***At the previous engagement, we found 2 instances*** within our judgmentally selected sample of 25 (representing 8% of that sample) had been granted what ORF refers to as a "delinquency adjustment."

It should be noted that the 15 accounts with a delinquency adjustment reported on the loan repayment history were found to have an average deferment (total for the account) equal to approximately 5.6 contractual payments, ***with a maximum of 21 payments*** and a minimum of one payment. We found four out of the 15 accounts found to include a delinquency adjustment on the loan repayment history ***reflected more than one delinquency adjustment*** on the account.

Per a previous conversation with Chris Murphy, once an account is established on recurring ACH payment arrangements and three good payments have been processed, ORF will bring the account current regardless of the contractual aging status, with any remaining past due amounts being added to the end of the contract ( deferment). Management also stated that the same sort of delinquency adjustment is processed in situations where another advance is made to an existing account debtor (consumer add-on). ***We were informed by management that, for accounts that are established on a recurring***

---

[7]    IDB_ORF PP2004_012450 - 1, from the report of the field examination report in December 2010. (BBR is a Borrowing Base Report). The issue of delinquency adjustments arose in the first report provided by KDMB after its field examination in June 2008.

***allotment arrangement, the "delinquency adjustment" will typically be granted after the first allotment payment is received.***

. . .

Subsequent to completion of the field work, management indicated that ORF would likely create a mechanism to report and track the incidence of delinquency adjustments.[8] (Emphasis supplied.)

69.     As was predicted in this report, ORF's receivables were kept on ORF's books and records and inflated the amount of assets that were reported as eligible for additional borrowing.

70.     These issues had been raised almost one year earlier when KDMB noted in a January 11, 2010 email to the primary officer at IDB told him, among other things, that:

Actual charge-offs recognized by the Company's borrowers are not processed in any consistent manner. ***ORF will allow its borrowers to maintain severely past due accounts on ORF's books, rather than recognizing a charge-off, because the accounts are not eligible for borrowing and the borrower pays ORF a fee for each account that is active on ORF's books.*** An additional complexity associated with many of ORF's borrowers is the fact that they operate car sales lots. As such, when they repossess a vehicle, they can simply take it back into inventory and resell the vehicle, perhaps never recognizing a charge-off (in a manner similar to "but here, pay here" lots, a business model with which we are very familiar) swapping a defaulted finance contract for a new one.

. . .

. . . However, we found the roll forward information to be of limited use, primarily because of the "netting" practices used by ORF in compiling this data (the netting procedures have been discussed in our field examination reports). ***In addition to the netting practice employed in compiling the roll forward data, ORF also does not track what the Company refers to as "delinquency adjustments" (deferments) and the incidence of rewritten contract (which we have discussed in our reports), which serve to "artificially" reduce the level of charge-offs***.[9]  (Emphasis supplied)

71.     KDMB also noted in a June 29, 2012 email to the primary officer at IDB that,

"***We have consistently found*** that the amount of reported collections for the loans ORF

---

[8]   IDB_ORF_PP2004_012452.

[9]   IDB_ORF_PP2004_018031.

extends to its client/borrowers is higher than the amount of reported collateral collections which, as we have discussed in previous ORF reports, does not seem logical."[10] (Emphasis supplied.)

72.    Many of these warnings were repeated by KDMB in every report after each semi-annual field exam from 2008 onward.  The specific warnings from the field examination reports from 2008 onwards included the following:

- ORF was making delinquency adjustments and re-aging installment contracts and not tracking these changes in the borrowing base.

- ORF management falsely represented to KDMB that such delinquency adjustments and reaging were immaterial and only occurred once over the life of a particular Consumer Loan.  KDMB's sampling revealed that the delinquency adjustments and reagings were likely prevalent throughout the Consumer Loans in the borrowing base, and on average actually were performed multiple times for each re-aged account  (not just once).

- ORF management "scrubbed" the data on delinquency adjustments that it presented to KDMB.

- ORF management falsely reported on its borrowing base certificate that it had not rewritten any installment contracts.[11]  KDMB pointed out in numerous field examination reports that it found ORF had rewritten contracts and was falsely stating in its certificates that no such rewrites had occurred.

- ORF was not following the policies identified in its audited financials concerning the charging off of uncollectible loans.

---

[10]   IDB_ORF_PP2004_020581.

[11]   Rewriting such contracts was a violation of the credit agreement.

- ORF maintained chronically overadvanced Dealer Loans for years without taking charge offs.  Indeed, large sections of each KDMB field examination report included a discussion (provided verbatim by Murphy) of the overadvances on these Dealer Loans.

- ORF's ledger recorded payments on Consumer Loans that could not always be tied to bank statements.

- ORF was advancing additional funds to dealers that were already overadvanced to ORF.  KDMB warned IDB (and through it the other Defendants) that this practice had effect of "masking" the deterioration in the overall collateral pool.  That is, the new collateral generated by the additional advances to these Dealers masked that ORF continued to keep the Dealers' bad debt on its books.

- ORF undertook no evaluation of a Dealer's dilution rate prior to making advances to that Dealer.  The Dealer's dilution rate represented the probable rate of default on loans.  KDMB warned the Defendants that ORF was likely advancing at a rate higher than the rate of dilution on some of its largest Dealer Loans, and thus was unlikely to recover on many of its advances.

- In most months, ORF was advancing more money to Dealers than it was collecting on the Dealer Loans.

- ORF made unreported side loans to Dealers, in violation of the credit agreement.

73.    KDMB also informed IDB in 2013 that ORF was in an overadvance position of more than $17 million on the facility agented by IDB.  The reason for the overadvance was that, in violation of the 2011 amendment and restatement of the Credit Agreement, ORF had included in the borrowing base the receivables from Dealer Loans in which ORF held less than a 50%

interest.[12] (That is, ORF had sold more than 50% in participations in those deals).

74.     KDMB's principal admitted at his deposition that he had reported a borrowing base fraud to IDB, although he never used the exact term "fraud".  KDMB's principal also admitted at his deposition that his warnings regarding ORF's actions went unheeded for years.

75.     In addition to the information provided by the field examiner, IDB received other information that put it on notice of ORF's insolvency and/or its fraud on its creditors.

76.     For example, IDB (and the other Defendants) received monthly reports from ORF regarding the borrowing base that provided information on the participations that ORF had sold in the prior month.  In those reports, ORF revealed to the Defendants that it sold millions of dollars of additional Participations in its Dealer Loans that the Defendants knew had chronic overadvances and that ORF had claimed to be writing down due to deteriorating collateral.  That is, ORF reported to Defendants that it was selling Participations in the very Dealer Loans that, as ORF also reported to Defendants, were unlikely to be repaid.

77.     IDB also learned by 2008 that ORF's co-founder, Jack Dell, was previously under a grand jury investigation for securities fraud.  IDB conducted no real follow up and did not provide this negative information to the other Defendants.

78.     With the exception of negative information on Jack Dell (and any information that was provided in a draft field examination report yet omitted from the final report), IDB passed on all of this information to the other Defendants.  Each of the Defendants deliberately turned a blind eye to the malfeasance reported to them.

79.     Capital One.  Defendant Capital One joined the lending facility in January 2010.  ORF also moved its primary operating account to Capital One as a condition of Capital One

---

[12]     ORF historically included such receivables in its borrowing base, with the knowledge and acquiescence of Defendants.  ORF may thus have been in an overadvance position on the facility before 2013.

joining the facility.

80.     Capital One had previously rejected the opportunity to enter the IDB facility on more than one occasion.  It again rejected the credit in September 2009 due to the issues identified in a KDMB examination report.   Senior management at Capital One sought a reconsideration of that rejection; CEO Richard Fairbank had a relationship with Jack Dell and had referred ORF as a potential client.  Even though ORF largely failed to address the concerns raised in the KDMB report or those raised by Capital One's relationship manager, Capital One nonetheless reversed course and approved entering the facility.  Capital One received periodic KDMB field examination reports thereafter, but did not follow up on the numerous warnings in those reports or the concerns identified by the relationship manager.

81.      Bank Leumi.  Leumi similarly received the KDMB examination reports on a regular basis and the warnings contained therein.  However, like Capital One, it did not follow up on the "red flags" of ORF's fraud found in those reports.

82.     Bank Hapoalim.  Prior to entering the facility in 2011, Hapoalim also received the KDMB examination report and the "red flags" therein.  It nonetheless entered the facility.

83.     Shortly after Hapoalim entered the facility, Hapoalim hired a new chief credit officer (Howard Ross).  When IDB asked Hapoalim in 2012 to increase its exposure to Oak Rock, Mr. Ross reviewed the KDMB field examination report and followed up with Mr. Murphy and with IDB.  Following those conversations, Mr. Ross rejected the requested increase and even sought to have Hapoalim exit the facility.

84.     Mr. Ross identified to his colleagues at Capital One many of the red flags described above, including that ORF was reaging its collateral.  He also alerted IDB to most of the red flags he had identified to his colleagues.  Ross noted that the failure of Oak Rock to track

dilution meant that ORF may need to take significant write-offs to its loans. Notably, Ross raised a concern that ORF's audited financials were unreliable: "It is unclear what scope of examination is being completed by the company's accountant, Eisner Amper, and if they have the ability to certify a financial statement without performing due diligence on the loan receivable and the dealer clients ability to repay."[13] All of this information was provided to Hapoalim before it entered the facility.

85.     Notwithstanding Mr. Ross' recognition of the red flags -- and his discussion of those "red flags" with IDB -- Hapoalim did not pull out of the facility and continued to receive payments from Oak Rock through IDB. IDB's internal closing memorandum dated November 30, 2012 notes that the closing on an extension request "was delayed because Bank Hapoalim (who provides a $7MM credit facility) had issues with the field exam report.. . ." It also notes that ORF is bringing in a separate consultant to assist it with collateral issues. [14] (In fact, no consultant assisted ORF on these issues, aside from signing a retainer letter.)

86.     IDB had a stated goal of obtaining a total of $100 million of financing from new lenders in the syndicated bank group[15] during that time period and was actively soliciting lenders with information packages that included a borrowing base certificate and supporting documents from ORF, ORF's compliance certificate and ORF's internal financial statements.

87.     The Defendants' knowledge and / or willful blindness prevent them from requesting relief under 11 U.S.C. § 548(c) as one that acted in "good faith" since they had

---

[13]    BH006997.

[14]    IDB_ORF_PP2004_023132.

[15]    Roy Grossman sent an email to Mr. Murphy on August 22, 2012 stating, among other things, "Additionally Leumi has recently advised that they expect to step up their commitment by $5MM. At this point, I am feeling more bullish on our ability to meet our goal of $100MM." (Dell_ORF_IDB00033814)

- 26 -

knowledge of the very fraud that was underway.

## Payments by Oak Rock to Defendants

88.     At all relevant times, ORF paid Defendants from a single comingled operating account that held all funds.  IDB has claimed in other pending adversary proceedings, that ORF's "records reflect the commingling of the Debtor's cash receipts."  In fact, IDB was aware throughout this period that Oak Rock comingled its funds in a single operating account, having been informed by Mr. Murphy.

89.     Most of the payments to Defendants were of interest only.  However, certain payments were to reimburse Defendants for their legal costs, and other payments were made that represented "fees" relating to the facility.

## IDB's Rating of the Risk of its Loan to Oak Rock v. Risk Ratings for Junk Bonds

90.     At all relevant times, IDB's internal Combined Credit Risk Rating for ORF's loan indicated[16] that IDB rated its credit risk as being higher than the comparable risk rating attributed to "junk bonds."[17]  Upon information and belief, IDB never advised any of the current, past or

---

[16]   IDB's Annual Report provides the following description of the CCRR

The System uses a 10-category CCRR scale with a 1-rating reflecting the best possible risk and a 10-rating reflecting the worst (loss).  In order to accommodate the Company's regulatory policies and guidelines, the four worst rating categories, which are referred to as "Criticized and Classified" categories (7 through 1 0), correspond directly to the regulatory classifications of Special Mention=7, Substandard=8, Doubtful =9, and Loss=1O. Following is a chart that summarizes the Company's 10-point scale, matching the CCRR to external ratings and bank regulatory scale:

. . .

| CCRR | External Debt Rating Equivalent |
|------|--------------------------------|
| 4    | BBB                            |
| 5    | BB                             |
| 6    | B                              |

…
Excerpt from http://www.idbny.com/pdfs/Audited_Financial_Statements_2013.pdf , p. 32.

[17]   According to NASDAQ, "**Junk Bonds** - These are the bonds that pay high yields to bondholders because the borrowers don't have any other option.  Their credit ratings are less than pristine,

prospective lenders or others providing funds for ORF through "loan participations" of IDB's assessment of the risk of its lending to ORF.

91.    IDB, having taken the position that all of the debts payable to ORF are part of its collateral and that "loan participations" have a lower priority (that of unsecured debt), necessarily have considered the "loan participations" to have greater credit risks than IDB was exposed to.[18]

92.    As noted above, ORF obtained substantial funding for its operations through the sale of "loan participations."   Over $60 million of its outstanding obligations were created through the sale of "loan participations."

93.    ORF's records reflect that between December 31, 2007 and February 28, 2013, the amount of the "loan participations" sold went from $25.9 million to $62.7 million.

94.    The various Credit Agreements executed by ORF and IDB both specifically contemplated and permitted the sale of "loan participations."[19]   Further, the periodic reports IDB required ORF to submit both excluded customer borrowing related to such "loan participations" from ORF's "Borrowing Base" and reflected such borrowing as being the "Participants share of collateral."   By way of example, the Computation of Borrowing Base 02/28/13 that Mr. Murphy signed on March 20, 2013 indicated that as of February 28, 2013 the "Total EOM Collateral"

---

making it difficult for them to acquire capital at an inexpensive cost.   Junk bonds are typically rated at BB/Ba or less."
http://www.nasdaq.com/investing/junk-bonds-everything-you-need-to-know.stm

[18]    See Appellant's Brief, p. 47, Case 2:14-cv-03873-SJF, Docket No. 10, U.S. District Court, Eastern District of New York.

[19]    These were defined as "Borrower Participations" in the 2011 Credit Agreement.   Sec. 7.8 of that document provided, in pertinent part, "No Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) other than (a) sales of Borrower Participations, . . . ."

was $295,127,349.14, the "Participants share of collateral" was $86,209,726.54, the Total Loans

(by ORF) was $187,452,402.28 from which "Participations" of $62,767,632.76 and other items

were deducted to calculate the "Eligible Loans" of $118,468,565.50. [20]

95.    When the primary loan officer at IDB contacted Marshall Perrin of Hapoalim on

September 21, 2010, he described the "loan participations" as follows in the section of the

message entitled "Participations", "The participant's interest in the loan transaction is limited

solely to its proportionate share of the loan. Oak Rock does not guarantee the participant's

investment in the loan transaction, nor does the participant have any priority or superior rights to

Oak Rock with respect to the collateral underlying the loan transaction. Oak Rock and the

participant share on a pari passu basis the loan exposure.  Participation transactions are common

practice in the lending industry."[21]

96.    This is consistent with the information Capital One received from its consultant

(Durkin Group) in November 2009 where it was noted, "Oak Rock has participated out

$44.3MM of the loans to several participants on a parri-passu basis resulting in net exposure to

Oak Rock of $98MM."[22]

97.    Capital One's underwriter acknowledged in the numerous Credit Approval

Memoranda that she prepared, "the Bank group is not senior to Participations sold by ORF".[23]

The Credit Memoranda were documents she prepared which recommended approving entering

into, or amending, the Credit Agreement.

---

[20]    This was apparently the final Borrowing Base certification that Mr. Murphy provided to ORF
and bears Bates Numbers IDB_ORF_PP2004_014847.

[21]    IDB_ORF_PP2004_012058 (12061-2).

[22]    IDB_ORF_PP2004_11548.

[23]    EXPORT0015316; EXPORT0003353.

- 29 -

98.     As such, any person or entity that was either a "loan participant" or was considering purchasing a "loan participation" and which requested copies of the loan documents reflecting ORF's borrowing from IDB would have reasonably concluded that neither IDB would have asserted that the portions of ORF's loans to customers that were related to the "loan participation" would be claimed to be part of the collateral claimed to secure the IDB debts.

99.     Creditors who provided ORF with millions of dollars in exchange for Participations discovered the extent of the harm they suffered when IDB contested their claims, first by arguing that Participations were unsecured debt to which IDB was senior, and then by reversing course and arguing that IDB was senior to the Participations and that Participants had no recourse against ORF.  IDB's argument that it holds a senior position to Participants, which was formulated after the fact for litigation, is contradicted by its prior statements, its consent to the sale of Participations, and the course of performance and course of dealing with ORF and with the other Defendants.

**Control and Foisting High Risk Debt Onto Participants**

100.     The various formulas included in the Credit Agreements (as they were amended from time to time) effectively required ORF to seek out funding from the sale of "loan participations" or other borrowing.  In doing so, unsuspecting Participants purchased very risky Participations at their expense and for the benefit of the Defendants -- the creditors with the most insight and information into ORF's financial condition and operations and the parties that knew or should have known that ORF's practices were inflating the amount of Dealer Loans while suppressing a host of problems occurring within the Dealer Loans and the Consumer Loan portfolio.

101.    Perhaps the most telling example of this occurred in February 2013 with the execution of Amendment No. 4 to the 2011 Credit Agreement when it was realized that Waiver and Amendment No. 3 was violated immediately upon its execution (and effective November 30, 2012)  since ORF was at that moment out of compliance with the covenant that limited its loans to Merchants Advance.  ORF was given sixty days to reduce the amount of that customer's debt carried on ORF's financial statements by selling millions of dollars of loan participations. ("Loan participations" were removed from ORF's assets on its balance sheet since each was reflected thereon as the transfer of the ownership of that portion of the respective loan to the "loan participant.")  This occurred at a time after the Defendants were  particularly aware of the issues that ORF's "delinquency adjustments" would create and while IDB also was diligently contacting other prospective members of the bank group in order to reduce its exposure.

102.    IDB's urgency for ORF to sell even more "loan participations" was very apparent in Jack Dell's email to an officer at Capital One on February 12, 2013 when he wrote, "At a meeting this afternoon by Roy Grossman, Ken Lipke [both of IDB] John Murphy, Tom Stephens and LISA BAUM [of IDB] . . . . Tom made it clear that Oak Rock needs more money now!!  WE NEED MONEY!!! . . . . "[24]  Before the company effectively stopped its business in April 2013, millions of dollars of new "loan participations" had been sold and IDB later asserted that each of those "loan participations" was actually a loan rather than an ownership interest in an underlying loan.

103.    IDB had control over ORF in a number of different ways.  A variety of provisions in the loan documents provided IDB with substantial control over ORF by creating a host of technical defaults that could, and in practice did, create potential defaults continually.  The actual

---

[24]   Dell_ORF_IDB00000143.

and potential defaults, coupled with Mr. Murphy's guaranty and his son-in-law's job at IDB, provided mechanisms for IDB to effectively control Mr. Murphy with a virtual Sword of Damocles (his guaranty and his daughter's husband's job) always hanging overhead.    The provisions in the 2011 Credit Agreement[25] (listed below) and the comparable provisions in the predecessor Credit Agreements are among those that provided such a high level of control include those listed below.  As noted above, IDB actually used those provisions to control ORF's efforts to actively solicit sales of "loan participations" to parties IDB later asserted to have general unsecured claims rather than ownership interests in various loans.

A.    The 2011 Credit Agreement included the following limitations on ORF in Section 7.17, "Borrower shall not make a loan, advance or other financial accommodation to any one Client/Dealer or its Affiliates which together with all other then outstanding loans, advances and other financial accommodations to such Client/Dealer and its Affiliates which in the aggregate exceed the lesser of (a) $6,400,000 and (b) 25% of the Capital Funds of Borrower except for loans, advances and other financial accommodations to (i) Auto Underwriters of America, Inc. which shall not exceed $11,000,000 at any one time outstanding, (ii) Merchants Advance which shall not exceed $8,200,000 at any one time outstanding, and (iii) MK Auto which shall not exceed $6,900,000 at any one time outstanding."  As noted herein this was amended after ORF violated this limitation and was forced to sell additional loan participations.  This provision also limited the new customers ORF could provide financing for.

B.    The 2011 Credit Agreement included the following limitations on ORF in Section 7.19, "After the Effective Date, Borrower shall not enter into any Client/Dealer Loan Agreement or any other agreement to provide a Client/Dealer and Affiliates of such Client/Dealer with loans, advances and other financial accommodations in excess of $5,000,000 in the aggregate at any one time

---

[25]    The 2011 Credit Agreement is attached as Exhibit "A" to the proof of claim filed in the bankruptcy case by IDB, Claim No. 6.

outstanding." This provision also limited the new customers ORF could provide financing for.

C.      The 2011 Credit Agreement included the following limitations on ORF in Section 7.15 that controlled what ORF could do with one of its primary operational documents - its lending manual (the "Loan Policy"), "Borrower will not make or allow to be made any amendment to the Loan Policy, other than amendments, that do not adversely affect the interest of Agent or Lenders without the prior written consent of Agent and the Supermajority Lenders."

D.      The 2011 Credit Agreement included the following limitations on ORF in Section 6.11, "No later than June 30, 2011, Borrower shall enhance its software programs to enable Borrower to provide Agent with such information as Agent shall require to determine dilution of Accounts."

E.      The 2011 Credit Agreement went even further in providing access and control to IDB when Annex D (referring to Sec. 5.1 of the Credit Agreement) required ORF to deliver to IDB "the internet access codes to Borrower's computerized Books and Records with respect to all Loan Receivables, Customer Obligations and the Collateral."[26]    Direct access into ORF's financial records reflects an extremely close relationship since it provides the ability to monitor ORF in real time if not to alter those records and reports that such access would provide.

F.      The 2011 Credit Agreement included the following limitation on ORF in Section 7.21, "The Borrower shall not change or amend the Operating Agreement, including . . . ."    ORF's Operating Agreement effectively placed Mr. Murphy in control of ORF's internal decision making processes.

G.      Annex F to the 2011 Credit Agreement included covenants to report the following financial metrics at the risk of being declared in default:  "a Senior Debt Ratio of not more than 2.75 to 1.00," a minimum amount "Capital Funds at the end of each Fiscal Quarter," a "Interest Coverage Ratio . . . of not less than 1.25 to 1.00" and that "Borrower shall not incur a Net Loss for any Fiscal Quarter."

---

[26]    A similar provision was included in each Credit Agreement or Loan Agreement dating to 2004.

H.      The 2011 Credit Agreement included the following requirement on ORF in Section 9.1(m) and (l) that made it an Event of Default if either, "John P. Murphy is no longer the chief operating officer or manager of Borrower" or "any Change of Control occurs."  As a matter of fact, IDB declared on April 23, 2013 that Mr. Murphy's resignation as an officer of ORF constituted an Event of Default that ultimately became one of two bases for accelerating the debt asserted by IDB. This provision of the Credit Agreement provided IDB with control over ORF through controlling Mr. Murphy.

I.      The 2011 Credit Agreement included the following provision in Section 5.2 that provided IDB with exceptional access to ORF's advisors, information and reporting, "Each Credit Party executing this Agreement authorizes (a) Agent . . . to communicate directly with its independent certified public accountants and authorizes and shall instruct those accountants and advisors to communicate to Agent and each Lender information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party."  Providing a lender with direct access to a customer's certified public accountant also gives a lender substantially more insight than the lender could ever obtain through obtaining periodic reports.

To the extent that other Credit Agreements included the same or similar provisions, the Committee on behalf of ORF's bankruptcy estate would show that such provisions enabled IDB to exert control over ORF and its operations.  IDB exerted such control over ORF during such times as those provisions were applicable in the Credit Agreements.

### Information regarding Loan Documents

104.     On or about July 19, 2001, ORF, as borrower, and IDB, as lender, entered into a General Security Agreement (the "*2001 Security Agreement*") and related documents and agreements (collectively, the "*2001 Loan and Security Agreements*", and such loan facility, as amended and restated, the "*2001 Loan Facility*"), pursuant to which IDB, inter alia, provided an $18,000,000.00 line of credit to ORF to finance the ORF's operations.  Under the 2001 Security Agreement, ORF provided a blanket lien on all assets for IDB's benefit.

105.    On July 31, 2001, IDB filed a UCC-1 financing statement (designated as Filing Number 10835905) (the "*2001 Financing Statement*") against ORF with the Delaware Secretary of State.  Like the 2001 Security Agreement, the 2001 Financing Statement provided a blanket lien on all of the "Debtor's now owned and hereafter acquired assets, including without limitation  all accounts, goods, inventory, equipment, instruments, documents, chattel paper, deposit accounts, letter of credit rights, commercial tort claims, financial assets, securities, and  all  other  investment property, general intangibles and all supporting obligations and products and proceeds of the foregoing."  Continuation financing statements were filed for the 2001 Financing Statement on each of May 23, 2006 (Filing Number 61736958) and May 17, 2011 (Filing Number 2011 1856387).

106.    IDB and ORF agreed to restate the terms and conditions of the 2001 Loan and Security Agreements pursuant to that certain Loan and Security Agreement, dated as of April 16, 2004 (as amended from time to time, the "*Restated 2001 Loan and Security Agreement*"). Under that agreement, IDB and ORF agreed to, among other things, increase the line of credit to $25,000,000.00, and grant to IDB a lien on all of the ORF's property and assets of any kind.  *See* § 3 (definition of "Collateral"), § 10 (definition of "Property") and § 3.1 (grant of collateral).

107.    In 2006, ORF actually paid off the 2001 Loan Facility and entered into a new financing with a syndicated group of banks for whom IDB was acting as the agent.  Specifically, pursuant to that certain Credit Agreement, dated as of May 9, 2006 (as amended, the "*Original 2006 Credit Agreement*," and such loan facility, the "*2006 Credit Facility*"), among ORF, as borrower, IDB, and certain lenders parties thereto, ORF borrowed $50,000,000 to (a) payoff the 2001 Loan Facility and (b) provide working capital and for general corporate purposes for the Debtor's business.  *See* § 2.7 of that Credit Facility.  The 2006 Credit Facility, however, neither

amended nor restated IDB's 2001 Loan Facility, but _expressly_ _required_ that the 2001 Loan Facility be paid off in full. *See* § 1 (Recitals) and § 2.7 (Use of Proceeds). The payoff was accomplished in 2006, the 2001 Loan Facility was paid in full and the liens securing the facility were extinguished.

108.    In addition, ORF and IDB entered into a new Security Agreement, dated as of May 9, 2006 (the "***Original 2006 Security Agreement***"). Unlike the 2001 Security Agreement and the Restated 2001 Loan and Security Agreement, the Original 2006 Security Agreement did _not_ provide for a blanket lien on all of ORF's assets, but _only_ granted a lien upon certain property set forth in a delineated list of assets. For example, in marked contrast to the 2001 Loan Facility, IDB was not granted a security interest in any "Goods" or "Equipment."

109.    Unlike the 2001 Financing Statement, the UCC-1 financing statement filed by IDB on May 9, 2006 (designated as Filing Number 61574979) (the "***2006 Financing Statement***") did _not_ describe a blanket lien on all assets, but instead described the collateral as only certain property set forth in a delineated list of assets – which list was consistent with the express language of the Original 2006 Security Agreement. Significantly, the 2006 Financing Statement also specifically referenced the Original 2006 Credit Agreement. Such particularized list of collateral and express reference to the Original 2006 Credit Agreement further distinguishes the 2006 Financing Statement from the 2001 Financing Statement.

110.    After IDB filed the 2006 Financing Statement for the 2006 Credit Facility, on May 9, 2006 IDB filed two UCC-3s amending the 2001 Financing Statement:  (a) the first filing purported to change IDB's name by adding the designation "as Administrative Agent" (Filing Number 61575125) and (b) the second filing purported to assign IDB's UCC interests to IDB (Filing Number 61575133). Neither of these filings amended the blanket lien aspects of the 2001

Financing Statement, nor amended the 2001 Financing Statement to make reference to the Original 2006 Credit Agreement.

111.    The 2006 Financing Statement was not continued and lapsed on the fifth anniversary of its filing.

112.    On October 3, 2012, IDB filed a UCC-1 financing statement (Filing Number 2012 3813302, the "*2012 Financing Statement*") with the Delaware Secretary of State (the "*UCC-1 Recordation*").  October 3, 2012 is more than 90 days but less than one year before the Petition Date.

113.    Additional defects with respect to the liens, encumbrances and security interests (and the perfection thereof) asserted by IDB are detailed in Adversary Proceeding Nos. 8-13-08075 and 8-13-08077 pending in this Court and incorporated by reference herein.

## Cause of Action No. 1 - Equitable Subordination of IDB Claims

114.    The actions of IDB in its dealings with ORF and its creditors as outlined herein was inequitable.

115.    The inequitable actions by IDB as described herein resulted in substantial amounts of harm to ORF's general unsecured creditors and also conveyed an unfair advantage upon IDB also described herein.

116.    Subordination of the claims asserted by IDB, under principles of equitable subordination, would be consistent with the Bankruptcy Code.  Further, upon equitably subordinating the claims asserted by IDB, any liens and security interests that may secure the repayment of those claims be transferred to the estate pursuant to 11 U.S.C. § 510(c)(2).

117.    Additionally, IDB had either actual or constructive knowledge beginning in 2009 of ORF's practices of "delinquency adjustments" and claiming credit for payments reportedly

received from its customers but that ORF never actually received.  IDB also had actual or constructive knowledge that ORF's statements regarding "delinquency adjustments" were contradicted by the information uncovered in the field examinations and included within the field examination reports.  As noted above, the Credit Agreements between ORF and IDB precluded ORF from modifying any of its practices or its credit policies without IDB's consent.  Such provisions prevented ORF from changing the policies and practices that benefitted IDB to the detriment of ORF's general unsecured and other creditors.  After being warned early and often about the activities that would later form the bases for Mr. Murphy's criminal conviction, IDB waited for years to "pull the plug" on ORF's operations and did so only after ORF could no longer proceed.

118.    Pleading further, if necessary, the inequitable acts of IDB include the efforts to shift unreasonably large credit risks associated with the various Credit Agreements and Dealer Loans from the IDB books and records and onto other creditors by using IDB's control and dominion provided by the Credit Agreements to its advantage.  This specifically includes the actions whereby other creditors were solicited to join the bank group as wells as compelling ORF to obtain additional assets through selling Participations that IDB would, within a few months in some cases, allege to actually be loans rather than acquiring partial ownership interests in specific debts.  IDB, after being warned of the practices that would eventually lead to ORF's closing and bankruptcy, continued taking actions to off load and reduce IDB's exposure to the ORF loan while - at the same time - encouraging others to take on that risk.  This essentially foisted that risk onto others, including Participants.

119.    Another effect of IDB's inequitable conduct was to encourage (or compel) ORF to sell additional Participations that IDB would soon thereafter argue to this Court were mere

unsecured loans rather than transferring an interest in one or more underlying loans. These actions resulted in direct, discernable and discrete losses to those Participants.

120.    IDB, having more information and insight into ORF's operations and the risks it was taking on, was in effect playing a "heads I win, tails you lose" game with the creditors and parties who purchased millions of dollars of Participations. IDB would be a direct beneficiary of the Participations because of the increased cash they generated which was then converted into increased Dealer Loans and Consumer Loans that the Participants would never realize.

121.    These actions, both individually and cumulatively over many years, were inequitable and resulted in substantial injury to ORF's creditors. Pursuant to 11 U.S.C. § 510(c)(1), IDB's claims must be equitably subordinated for purposes of distribution to a priority that is junior to the general unsecured claims that are allowed against ORF. Additionally, pursuant to 11 U.S.C. § 510(c)(2), all liens upon the funds segregated with regard to the Leumi Participation should be transferred to the Committee for the benefit of ORF's estate.

**Cause of Action No. 2 -  Preferential Transfer (UCC-1 Recordation in 2012)**

122.    IDB's recordation of a UCC-1 financing statement (Filing No. 2012 3813302) on October 3, 2012 (the "***UCC-1 Recordation***" of the "***2012 Financing Statement***") is a transfer of an interest property of ORF as described in 11 U.S.C. § 547.

123.    IDB is an "insider" as defined in 11 U.S.C. § 101.

124.    The UCC-1 Recordation occurred within one year before the Petition Date.

125.    The UCC-1 Recordation was made to or for the benefit of IDB on account of an antecedent debt that was owed by ORF before the UCC-1 Recordation occurred.

126.    The UCC-1 Recordation occurred when ORF was insolvent as defined in 11 U.S.C. § 101.  Specifically, the sum of ORF's debts was greater than the value all of ORF's property, at a fair valuation when the UCC-1 Recordation occurred.

127.    The UCC-1 Recordation would enable IDB to receive more than it would receive if ORF's bankruptcy case were a case under Chapter 7 of the Bankruptcy Code, the UCC-1 Recordation had not occurred and IDB received payment of its claims to the extent provided by the Bankruptcy Code.  Without the UCC-1 Recordation, IDB would be a general unsecured creditor instead of asserting a secured claim.

128.    As a result of the avoidance of the UCC-1 Recordation, IDB's lacks any perfected liens upon and security interests in the assets of ORF and any claim it has would be wholly unsecured and the secured status asserted in ORF's assets must be rejected and denied.

129.    Pursuant to 11 U.S.C. § 547 and 11 U.S.C. §§ 550 and 551, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding the UCC-1 Recordation, (b) directing that the UCC-1 Recordation be set aside, and (c) requiring IDB, as the recipient of the transfers of ORF property, and/or the person for whose benefit the transfer of ORF property was made, and/or a subsequent transferee thereof, to return the property that was transferred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate. Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

### Cause of Action No. 3 - Declaratory Judgment Regarding Funds Held in Segregated Accounts and 2001 Financing Statement

130.    There presently exists a dispute regarding the funds currently held in segregated accounts under the direction and control of the Court as a result of IDB's assertion of a lien upon such funds.  A case and controversy exists with respect to the funds currently held in segregated accounts by ORF.

130565070.1

131.    To the extent that one or more of the causes of action stated in this Complaint are sustained and judgment is granted in favor of the Committee for the benefit of ORF's bankruptcy estate, the secured claim asserted by IDB would be reduced, eliminated or effectively rendered an unsecured claim.

132.    To the extent that the secured claim asserted by IDB is reduced, eliminated or effectively rendered an unsecured claim, the segregated funds held (or to be held) in one or more accounts as a result of collections upon receivables and notes that were payable to ORF become free and clear of liens, claims and encumbrances.

133.    The Committee prays that all funds owned by ORF and held (or to be held) in segregated accounts because of the secured claim asserted by IDB be released from all restrictions and segregation, declared to be unencumbered by any claims asserted by IDB and transferred to be part and parcel of the unencumbered assets of ORF's bankruptcy estate.

134.    Further, the Committee is entitled to a declaratory judgment that the 2001 Financing Statement is of no further force, effect or consequence as a result of the satisfaction and payment in full of the debt evidenced by the 2001 Credit Agreement.  When IDB provided credit in favor of ORF during 2006, ORF paid all of the obligations under 2001 Credit Agreement and satisfied those obligations in full.  The Committee is entitled to a declaratory judgment that the 2001 Financing Statement was satisfied, any liens securing the 2001 borrowing and the 2001 Financing Statement became ineffective.

135.    The Committee, on behalf of the estate, also seeks a declaratory judgment that the 2001 Financing Statement be terminated and declared to be of no further force or effect.

## Cause of Action No. 4 - Objections to IDB Claims (No. 6 and 11)

136.    In an Order dated July 11, 2013, the Court established September 3, 2013 as the last date to file a claim in the Plaintiff's estate.  IDB filed Proof of Claim No. 6 asserting a secured claim in the amount of "not less than $89,910,826.88" and IDB filed Proof of Claim No. 11 asserting a general unsecured claim in the amount of "not less than $5,213,863.14."

137.    IDB received transfers that were avoidable under 11 U.S.C. §§ 544, 547 and 548 and IDB is in possession of property that is preserved for the benefit of the estate under 11 U.S.C. § 551and that is recoverable under 11 U.S.C. §§ 550 and 553.  As a matter of law under 11 U.S.C. § 502(d), the Court must disallow the claims asserted by IDB unless and until such time as the amounts have been paid, the property turned over, the obligations avoided or the estate has otherwise recovered the avoidable transfers IDB received.

138.    The causes of action stated herein also include counterclaims to the claims asserted by IDB that would reduce the amount of any claims that might be allowed.

139.    Additionally, as a result of the avoidance of the UCC-1 Recordation, IDB's alleged liens upon and security interests in the assets of ORF are wholly unsecured and the secured status asserted in ORF's assets must be disallowed.

140.    As a result of and in addition to the equitable subordination of the claims asserted by IDB, IDB's alleged liens upon and security interests in the assets of ORF are wholly unsecured and the secured status asserted in ORF's assets must be disallowed.

141.    As a result of and in addition to each of the other causes of action stated herein as well as other bases for objections to be developed in discovery, the proofs of claim filed by IDB must be disallowed.

### Cause of Action No. 5 - Objection to
### "Adequate Protection" Relief, including Replacement Liens

142.    The cash collateral orders entered in this case included the grant of various adequate protection rights and replacement liens upon property owned by IDB as if IDB would have an allowed secured claim.  In the absence of an allowed secured claim, there can be neither adequate protection rights nor any "replacement liens."

143.    As a result of, and in addition to each of the other causes of action stated herein, the disallowance, in whole or in part, of the secured claim asserted by, IDB's claimed replacement liens upon and security interests in the assets of ORF are wholly unsecured and the post-petition secured status in ORF's assets asserted by IDB must be disallowed.  Likewise, IDB's claimed super-priority administrative expense claims (alleged pursuant to the cash collateral orders and 11 U.S.C. §§ 507(b) and 361) must be disallowed.

### Cause of Action No. 6 - Fraudulent Transfers of Property (11 U.S.C. § 548)

144.    During the two years preceding the Petition Date, ORF made transfers of ORF property to IDB, including but not limited to the cash payments identified at Exhibit A.  These transfers include all payments made to IDB that may have been designated as "interest" or "principal" as well as payments of "fees" of any kind or character.  The total amount of such payments is unknown at this time and will be ascertained through discovery.

145.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier.  Upon information and belief, ORF's operations during that time period were in furtherance of his fraudulent scheme and the transfers of ORF property to IDB were part and parcel of that fraud.

146.    The property was transferred with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to on or after the date of each payment.

147.    From and after 2009 (if not earlier), ORF was insolvent because the sum of ORF's debts was greater than all of ORF's property, at a fair valuation.

148.    At the time of each of the transfers, IDB knew or should have known of the fraud and falsification that was ongoing at ORF because of, among other things, the information it received in connection with the field examination reports.  Thus, IDB received the transfers without good faith and with knowledge of their avoidability.  Accordingly, IDB is not entitled to a replacement lien pursuant to 11 U.S.C. § 548(c).

149.    Pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding all of such transfers of ORF property to IDB, (b) directing that the transfers of all such ORF property be set aside, (c) requiring IDB, as the recipient of the transfers of all such ORF property that was incurred, and/or the person for whose benefit the transfer of all such ORF property, and/or a subsequent transferee thereof, to return the property that was transferred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate, and (d) denying IDB a replacement lien pursuant to 11 U.S.C. § 548(c).  Additionally, any avoided lien must be preserved for the benefit of ORF's bankruptcy estate.

### Cause of Action No. 7 - Fraudulent Transfers
### by Incurring Debt (11 U.S.C. § 548)

150.    During the two years preceding the Petition Date, ORF incurred obligations in favor of IDB, including but not limited to the obligations identified in Exhibit B.  The debt that was incurred includes increases in the amount of the obligations asserted by IDB.  The total amount of such debt will be ascertained through discovery.

151.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by IDB, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier.   Upon

information and belief, ORF's actions and operations during that time period were in furtherance of his fraudulent scheme and the incurrence of obligations in favor of, IDB were part and parcel of that fraud.

152. Such obligations were incurred with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to on or after the date of each payment.

153. From and after 2009 (if not earlier), ORF was insolvent because the sum of ORF's debts was greater than all of ORF's property, at a fair valuation.

154. At the time of each of the debt incurrences, IDB knew or should have known of the fraud and falsification that was ongoing at ORF because of, among other things, the information it received in connection with the field examination reports. Thus, IDB received each such obligation being incurred without good faith and with knowledge of their avoidability. Accordingly, IDB are not entitled to a replacement lien pursuant to 11 U.S.C. § 548(c).

155. Pursuant to 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 550, the Committee on behalf of the ORF bankruptcy estate is entitled to judgment: (a) avoiding the incurrence of such debt, (b) directing that the incurrence of such debt be set aside, (c) requiring IDB, as the counterparty to the ORF debt that was incurred, and/or the person for whose benefit incurrence of debt was made, and/or a subsequent transferee thereof, to transfer such debt that was incurred, or the value thereof, to the Committee for the benefit of ORF's bankruptcy estate, and (d) denying IDB a replacement lien pursuant to 11 U.S.C. § 548(c). Additionally, any avoided lien must be preserved for the benefit of ORF's bankruptcy estate.

**Cause of Action No. 8 - Fraudulent Transfers of Property under
New York Law regarding Fraudulent Conveyances, 11 U.S.C. §§ 544 and
550 and N.Y. Debt. & Cred. §§ 276, 276-a, 278, and 279**

156.    During the six years preceding the Petition Date, ORF made transfers of ORF property to Defendants, including but not limited to the cash payments identified in Exhibit A. These include all payments made to Defendants that may have been designated as "interest" or "principal" as well as payments of "fees" of any kind or character.  The payments include, but are not limited to, the payments identified at Exhibit A.  Additional payments will be ascertained through discovery.

157.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by Defendants, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier. Upon information and belief, Defendants' operations during that time period were in furtherance of his fraudulent scheme and the transfers of ORF property to Defendants were part and parcel of that fraud.

158.    At all relevant times there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against ORF that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

159.    The transfers of such property (including payments) were made with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to or after the date each transfers was made.  Mr. Murphy caused ORF to make such transfers to or for the benefit of Defendants in furtherance of a fraudulent scheme.

160.    At the time of the transfers, Defendants were aware or should have been aware of the fraud and falsification that was ongoing at ORF because of, among other things, the

information it received in connection with (i) the field examination reports, (ii) the monthly borrowing base reports, (iii) their Know Your Customer investigations, and (iv) information from other Defendants.  Thus, Defendants received the transfers without good faith and with knowledge of their avoidability.

161.    Pursuant to N.Y. Debt. & Cred. §§ 276, 278, and 279, and 11 U.S.C. §§ 544 and 550, the Committee is entitled to judgment: (a) avoiding all such transfers, (b) directing that all such transfers be transferred to the Committee for the benefit of ORF's estate, (c) requiring Defendants, as recipients of such transfers and/or the person for whose benefit such transfers were made, to return such transfers, or the value thereof, to the Committee for the benefit of the ORF bankruptcy estate, and (d) recovering attorneys' fees from Defendants.  Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

**Cause of Action No. 9 - Fraudulent Transfers Incurrence of Debt
under New York Law regarding Fraudulent Conveyances, 11 U.S.C. §§ 544 and
550 and N.Y. Debt. & Cred. §§ 276, 276-a, 278, and 279**

162.    During the six years preceding the Petition Date, ORF incurred obligations in favor of both IDB and Defendants, including but not limited to the obligations identified in Exhibit B.  Such debt that was incurred includes increases in the amount of the obligations asserted by IDB.  Additional debt will be ascertained through discovery.

163.    As noted in the plea agreement of Mr. Murphy and alleged elsewhere by Defendants, the operations of ORF were fraudulent from and after January 1, 2009, if not earlier. Upon information and belief, ORF's operations during that time period were in furtherance of his fraudulent scheme and the incurrence of obligations in favor of, Defendants were part and parcel of that fraud.

164.    At all relevant times there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against ORF that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

165.    Each such incurrence of debt was made with the actual intent to hinder, delay, or defraud entities to which ORF was or became indebted to or after the date each such transfer was made.  Mr. Murphy caused ORF to incur the debt to or for the benefit of Defendants in furtherance of a fraudulent scheme.

166.    At the time of each such incurrence of debt, Defendants were aware or should have been aware of the fraud and falsification that was ongoing at ORF because of, among other things, the information they received in connection with (i) the field examination reports, (ii) the monthly borrowing base reports, (iii) their Know Your Customer investigations, and (iv) information from other Defendants.  Thus, Defendants received the transfers without good faith and with knowledge of their avoidability.

167.    Pursuant to N.Y. Debt. & Cred. §§ 276, 278, and 279, and 11 U.S.C. §§ 544 and 550, the Committee is entitled to judgment: (a) avoiding the incurrence of each such debt, (b) directing that the incurrence of such debt be set aside, (c) requiring Defendants, as recipients of the incurrence of debt and/or the person for whose benefit the incurrence of debt was made, to return each such incurrence of debt, or the value thereof, to the Committee for the benefit of the ORF bankruptcy estate, and (d) recovering attorneys' fees from Defendants.  Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

**Cause of Action No. 10 - Relief Against Members of the Bank Group**

168.    As noted above, IDB acted on behalf of the lenders that comprised the syndicated bank group, including Leumi, Capital One and Hapoalim.  The relief requested against IDB in

each of the causes of action herein, including avoidance of transfers and debt as well as judgments for monetary relief, should be ordered against all lenders, including Leumi, Capital One and Hapoalim.

169.    The relief is sought against the lenders, including Leumi, Capital One and Hapoalim because (a) IDB acted as their agent, and / or (b) they are either mediate or immediate transferees (in each specific instance) and obligated to pay or return property pursuant to 11 U.S.C. §550(a)(1) and (2).    Additionally, any avoided lien is preserved for the benefit of ORF's bankruptcy estate.

**WHEREFORE**, the Committee respectfully requests the Court to enter judgment as requested in connection with each such Cause of Action outlined above and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York          PERKINS COIE LLP
       April 11, 2016


                                   By  */s/David F. Olsky*
                                       Schuyler G. Carroll
                                       John D. Penn
                                       David F. Olsky
                                   30 Rockefeller Plaza, 22nd Floor
                                   New York, New York  10112-0085
                                   Tel: 212.262.6900
                                   Fax: 212.977.1649
                                   scarroll@perkinscoie.com
                                   jpenn@perkinscoie.com
                                   dolsky@perkinscoie.com

                                   Attorneys for the Official
                                   Committee of Unsecured Creditors

**EXHIBIT A**

| Date | Transfer | Date | Transfer |
|---|---|---|---|
| 1/2/2009 | 21,726.33 | 7/1/2009 | 328,125.00 |
| 1/5/2009 | 850.00 | 7/10/2009 | 9,000.00 |
| 1/5/2009 | 33,333.33 | 7/31/2009 | 1,500,000.00 |
| 1/5/2009 | 306,666.67 | 8/3/2009 | 20,248.89 |
| 1/30/2009 | 1,000,000.00 | 8/3/2009 | 334,177.19 |
| 2/2/2009 | 19,038.83 | 8/3/2009 | 58,043.01 |
| 2/3/2009 | 850.00 | 8/5/2009 | 10,663.33 |
| 2/3/2009 | 364,708.33 | 8/7/2009 | 16,423.61 |
| 3/2/2009 | 17,739.05 | 8/31/2009 | 1,500,000.00 |
| 3/3/2009 | 17,444.78 | 9/1/2009 | 20,050.24 |
| 3/9/2009 | 1,000,000.00 | 9/1/2009 | 358,736.08 |
| 3/10/2009 | 850.00 | 9/30/2009 | 1,500,000.00 |
| 3/10/2009 | 322,291.67 | 10/1/2009 | 19,577.10 |
| 3/23/2009 | 25.00 | 10/1/2009 | 339,968.81 |
| 3/31/2009 | 1,000,000.00 | 10/6/2009 | 3,862.04 |
| 4/1/2009 | 19,601.70 | 11/2/2009 | 20,217.71 |
| 4/3/2009 | 850.00 | 11/2/2009 | 344,121.39 |
| 4/3/2009 | 352,479.17 | 11/3/2009 | 1,500,000.00 |
| 4/30/2009 | 1,000,000.00 | 11/20/2009 | 5,431.76 |
| 5/1/2009 | 19,000.50 | 11/27/2009 | 14,150.57 |
| 5/7/2009 | 850.00 | 12/1/2009 | 19,841.06 |
| 5/7/2009 | 369,979.17 | 12/1/2009 | 1,500,000.00 |
| 6/1/2009 | 20,110.94 | 12/1/2009 | 326,072.88 |
| 6/1/2009 | 310,333.24 | 12/31/2009 | 1,500,000.00 |
| 6/1/2009 | 33,250.00 | 1/4/2010 | 20,656.23 |
| 6/17/2009 | 38,002.15 | 1/4/2010 | 343,333.23 |
| 7/1/2009 | 1,000,000.00 | 1/6/2010 | 472.22 |
| 7/1/2009 | 19,399.48 | 1/27/2010 | 9,500.00 |

| Date | Transfer | Date | Transfer |
|---|---|---|---|
| 2/1/2010 | 21,212.98 | 8/2/2010 | 325,500.00 |
| 2/1/2010 | 335,833.23 | 8/5/2010 | 2,066.06 |
| 2/5/2010 | 226,156.60 | 8/9/2010 | 39,611.94 |
| 3/1/2010 | 18,640.00 | 9/1/2010 | 19,084.69 |
| 3/1/2010 | 850.00 | 9/1/2010 | 850.00 |
| 3/1/2010 | 304,628.24 | 9/1/2010 | 327,000.03 |
| 3/2/2010 | 120,293.80 | 9/9/2010 | 15,350.02 |
| 3/2/2010 | 277,500.00 | 10/1/2010 | 18,391.04 |
| 4/1/2010 | 22,782.03 | 10/1/2010 | 850.00 |
| 4/1/2010 | 20,092.90 | 10/1/2010 | 320,000.10 |
| 4/1/2010 | 850.00 | 10/7/2010 | 50,000.00 |
| 4/1/2010 | 335,879.48 | 11/1/2010 | 19,499.73 |
| 4/22/2010 | 49,730.29 | 11/1/2010 | 850.00 |
| 5/3/2010 | 19,350.30 | 11/1/2010 | 331,833.39 |
| 5/3/2010 | 850.00 | 11/22/2010 | 9,500.00 |
| 5/3/2010 | 324,999.90 | 12/1/2010 | 19,118.35 |
| 5/28/2010 | 2,000,000.00 | 12/1/2010 | 850.00 |
| 6/1/2010 | 850.00 | 12/1/2010 | 325,166.57 |
| 6/1/2010 | 334,499.91 | 12/17/2010 | 169,412.87 |
| 6/1/2010 | 20,177.47 | 1/3/2011 | 20,651.01 |
| 6/7/2010 | 99,060.42 | 1/3/2011 | 850.00 |
| 6/30/2010 | 50,000.00 | 1/3/2011 | 341,000.00 |
| 7/1/2010 | 19,318.14 | 1/6/2011 | 504,031.47 |
| 7/1/2010 | 850.00 | 1/10/2011 | 50,000.00 |
| 7/1/2010 | 315,000.00 | 2/1/2011 | 18,673.87 |
| 7/8/2010 | 190,544.35 | 2/1/2011 | 850.00 |
| 8/2/2010 | 19,327.10 | 2/1/2011 | 341,000.00 |
| 8/2/2010 | 850.00 | 2/2/2011 | 8,750.00 |

| Date | Transfer | Date | Transfer |
|---|---|---|---|
| 3/1/2011 | 16,754.42 | 9/1/2011 | 287,100.44 |
| 3/1/2011 | 850.00 | 10/3/2011 | 15,672.90 |
| 3/1/2011 | 312,666.76 | 10/3/2011 | 850.00 |
| 4/1/2011 | 64,479.90 | 10/3/2011 | 282,071.90 |
| 4/1/2011 | 18,556.60 | 10/3/2011 | 15,313.15 |
| 4/1/2011 | 850.00 | 10/12/2011 | 26,250.00 |
| 4/1/2011 | 346,333.43 | 11/1/2011 | 16,147.09 |
| 4/5/2011 | 500,000.00 | 11/1/2011 | 850.00 |
| 4/20/2011 | 49,999.16 | 11/1/2011 | 302,751.38 |
| 5/2/2011 | 17,639.39 | 11/21/2011 | 513.73 |
| 5/2/2011 | 850.00 | 12/1/2011 | 15,621.90 |
| 5/2/2011 | 339,999.90 | 12/1/2011 | 850.00 |
| 5/4/2011 | 9,500.00 | 12/1/2011 | 299,759.40 |
| 5/31/2011 | 91,280.98 | 12/8/2011 | 12,527.63 |
| 6/1/2011 | 18,101.58 | 12/27/2011 | 127,892.62 |
| 6/1/2011 | 850.00 | 1/3/2012 | 16,061.44 |
| 6/1/2011 | 337,406.13 | 1/3/2012 | 850.00 |
| 7/1/2011 | 17,186.40 | 1/3/2012 | 309,751.38 |
| 7/1/2011 | 850.00 | 1/9/2012 | 265,000.00 |
| 7/1/2011 | 257,870.66 | 2/1/2012 | 16,540.48 |
| 7/1/2011 | 211,085.63 | 2/1/2012 | 850.00 |
| 8/1/2011 | 16,941.19 | 2/1/2012 | 309,751.38 |
| 8/1/2011 | 850.00 | 2/16/2012 | 8,750.00 |
| 8/1/2011 | 279,875.00 | 2/21/2012 | 9,500.00 |
| 8/1/2011 | 10,000.00 | 3/1/2012 | 15,683.31 |
| 8/3/2011 | 193,471.64 | 3/1/2012 | 850.00 |
| 9/1/2011 | 16,239.97 | 3/1/2012 | 289,767.42 |
| 9/1/2011 | 850.00 | 4/2/2012 | 16,872.52 |

130565070.1

| Date | Transfer | Date | Transfer |
|---|---|---|---|
| 4/2/2012 | 850.00 | 11/1/2012 | 17,168.21 |
| 4/2/2012 | 309,751.38 | 11/1/2012 | 850.00 |
| 4/19/2012 | 90,000.00 | 11/1/2012 | 330,876.38 |
| 5/1/2012 | 16,570.50 | 12/3/2012 | 17,315.30 |
| 5/1/2012 | 850.00 | 12/3/2012 | 324,509.40 |
| 5/1/2012 | 299,759.40 | 12/10/2012 | 100,000.00 |
| 5/4/2012 | 18,750.00 | 12/13/2012 | 300,000.00 |
| 5/4/2012 | 5,000.00 | 12/31/2012 | 26,555.70 |
| 5/8/2012 | 8,575.85 | 1/2/2013 | 17,970.17 |
| 6/1/2012 | 17,198.54 | 1/2/2013 | 850.00 |
| 6/1/2012 | 850.00 | 1/2/2013 | 343,882.50 |
| 6/1/2012 | 315,501.38 | 1/4/2013 | 200,000.00 |
| 6/25/2012 | 47,882.50 | 1/17/2013 | 30,000.00 |
| 7/2/2012 | 16,582.59 | 2/1/2013 | 19,056.17 |
| 7/2/2012 | 850.00 | 2/1/2013 | 850.00 |
| 7/2/2012 | 307,259.40 | 2/1/2013 | 347,654.35 |
| 8/1/2012 | 17,051.98 | 2/8/2013 | 8,750.00 |
| 8/1/2012 | 850.00 | 2/11/2013 | 200,000.00 |
| 8/1/2012 | 317,501.38 | 3/1/2013 | 17,835.09 |
| 8/27/2012 | 12,087.08 | 3/1/2013 | 850.00 |
| 9/4/2012 | 17,074.18 | 3/1/2013 | 314,687.80 |
| 9/4/2012 | 850.00 | 3/4/2013 | 20,000.00 |
| 9/4/2012 | 323,563.88 | 4/1/2013 | 20,107.84 |
| 9/11/2012 | 11,010.15 | 4/1/2013 | 850.00 |
| 10/1/2012 | 16,524.00 | 4/1/2013 | 348,404.35 |
| 10/1/2012 | 850.00 | 4/3/2013 | 8,000.00 |
| 10/1/2012 | 316,634.40 | 4/9/2013 | 9,387.97 |
| 10/16/2012 | 25,000.00 | **Total:** | **$38,660,299.60** |

**Exhibit B**

1) Obligations incurred by the Debtor to the Defendants with respect to any amendments after January 1, 2009 to the May 9, 2006 Credit Agreement between the Debtor, certain lenders, and Israel Discount Bank of New York ("IDB"), as Agent, including but not limited to the obligations incurred to the Defendants in (i) the Fourteenth Amendment, dated January 29, 2010, and (ii) the Fifteenth Amendment, Dated March 31, 2011.

2) Obligations incurred by the Debtor to the Defendants with respect to the Amended and Restated Credit Agreement between the Debtor, the Defendants, and IDB, as Agent, Dated May 27, 2011 and all related documents and any and all amendments, including but not limited to obligations incurred to the Defendants in (i) the Amended and Restated Security Agreement Dated May 27, 2011, (ii) Amendment No. 2 to the Amended and Restated Credit Agreement, dated September 7, 2011, and (iii) the promissory notes issued by the Debtor to the Defendants referenced in the Amended and Restated Credit Agreement.

3) The October 12, 2010 amendment and the May 17, 2011 continuation of the July 31, 2001 UCC-1 Financing Statement referenced in the proof of claim filed by IDB, as Agent, Claim No. 6 in the Claims Register (the "IDB Claim").

4) The October 3, 2012 UCC- Financing Statement referenced in the IDB Claim.

5) The Amerimerchant Loan Participation dated February 13, 2012 between the Debtor and Bank Leumi, and the U.S. Military Loans Inc. Loan Participation dated January 31, 2013 between the Debtor and Bank Leumi, referenced in the proof of claim filed by Bank Leumi, Claim No. 17 in the Claims Register.

6) The July 27, 2009 Continuation of the IDB UCC-1 Financing Statement for IDB's purported participation interest in the Debtor's loan to Luther Appliances and Furniture Sales, Inc.